Case number 11-3067. United States of America v. Heyward Carzell Sanders, also known as Randolph Peoples, also known as Slim Appellant. Ms. Dyer for the Appellant, Ms. Ricard for the Affiliate. Good morning and may it please the Court. Beverly Dyer on behalf of Heyward Sanders. The evidence in this case, viewed in the light most favorable to the government, showed not one but four separate conspiracies. And at the outset, I would just like to clarify with the Court's permission that when I refer to the evidence or describe the evidence, my intent is to describe it in the light most favorable to the government and it is not to admit that my client committed certain drug crimes. And that is in the briefs and the oral argument. The government argues that the evidence showed one conspiracy. It is our position that that is not correct. We argue that there is no evidence that Sanders knew about any conspiratorial agreement or its scope. At most, he knew that the drugs would be distributed. But that is not sufficient for this Court to find that there was a common goal between the participants. And that is clear from direct sales. But it also should be clear because otherwise every middleman drug distributor all the way back to an Afghan poppy farmer would be liable for conspiracy. So here there was no common goal, there was no interdependence between the participants, and there was no overlap of participants. Joseph and Sanders were indifferent to their sources of supply and their other buyers. There was no evidence that Sanders knew anything about Joseph's activities in Potomac Gardens, and there was no evidence of shared trust and no warnings of police presence or other type of effort to protect each other. What about the, on the question of his knowledge about Joseph's activity in the gardens, what about the March 15th, 2010 wiretap? First it's after the fact. Second of all, it is... It is after the fact, but it discusses something that happened before. That is... It does, but it is, it is, it is Joseph Leake's information that Matthew Joseph is doing well in Potomac Gardens. That is not Sanders. Right, but Sanders responds to it saying, yeah, he used to purchase from you, and then when Leake gets sort of dense about that, he repeats several times, it just said he used to purchase from you. That's the building that you used to, he used to come and see you at the shopping center in the greens. That means that Sanders was able to identify Fat Mac, a fat somebody, as this person who Leake was referring to. It was Fat Mac, right? He used the word, Sanders. He was the... Well, it was known, Joseph admitted that that was his nickname. Right. And it is Leake, it is only Leake who has the information that Joseph is doing well in Potomac Gardens. It is not Sanders. Sanders at most identifies that individual. Is your claim that Leake and Sanders engaged in a separate conspiracy? That is our argument. What do you do with the fact that Leake's plea of guilty to conspiracy involving Potomac Gardens was admitted in the evidence? Well, Leake has... Isn't that conclusive that it was not a separate conspiracy? He pled guilty to being a part of the conspiracy involving Potomac Gardens. Well, the indictment does not state Potomac Gardens. The indictment states drug dealing in the District of Columbia and elsewhere, which is extremely broad, and that is one reason the jury might have confused the various conspiracies in this case. Had the indictment stated drug dealing in Potomac... What about the plea... The plea agreement? Joseph Leake's plea agreement? Well, I don't know if there's... What did the paper with the plea of Leake... Leake's plea, which was admitted into evidence, what did that say? I would have to check that, and I don't have it in front of me. But I believe it said to the indictment, and the indictment said drug dealing in the District of Columbia. Leake was arrested with some drugs in 2010, and a gun was found, I believe, in his residence or somewhere associated with him. He had reasons to perhaps plead to conspiracy and not to go into the substance accounts he was charged with, and the government did not hold him responsible for the 922G charge that he was indicted for. So Leake may have had reasons to plead to a conspiracy that he was not necessarily associated with. I don't know why Leake would have done that. I don't... I'd have a reading into Leake's motive or thinking in entering that plea. But I don't think that the evidence in Sanders' case showed any... First of all, the March 15th, 2010 phone call demonstrates that Leake had no idea before that who this person, Joseph, was. This is the first time that he has learned recently that there is somebody named Fat Somebody, who doesn't even know his nickname, doing well in Potomac Gardens. He wants to purchase from him at that point. That demonstrates the indifference that these parties had to their buyers and suppliers. How much did... What was the evidence of how much heroin Leake sold to Sanders? None. There's no... Well, if it... Well, there's evidence... How much? I'm sorry. There's evidence discussing quantity of money, I believe, but not quantity of drugs. So since the jury found 100 grams conspiracy of 100 grams or more of heroin, that would suggest they did not find a separate Leake-Sanders conspiracy. But the jury asked, before they made that finding, must we answer yes to... Okay, but that's a separate question. Assume you lose that point and that we don't find a problem with the verdict form and with the instruction. I'm not suggesting... Okay. Then isn't the jury telling you which... that that's not a separate conspiracy that it found? The first time the jury asked that question, they obviously could not find 100 grams. There was no reason for them not to find 100 grams with respect to Joe's sales to... Joe... Sanders' sales to Joe's. So that the only reason they would have asked that question is if some jurors, at that point, at least early in the proceedings, did not find 100 grams. And the only way that they could have not found 100 grams but still attributed Sanders' conspiracy conviction to Sanders is if they blamed him for the Leake conversations, which were extraordinarily... were terribly... I'm still not... I'm not following that. They had a follow-up instruction. Assume you lose your argument that the instruction isn't good enough. Just so we separate which the arguments are. Then they found a 100-gram heroin conspiracy, which they couldn't have found just between Leake and Sanders. That being the case, your argument that there was a separate... that there was a unanimity problem, for example, or something else... Right. ...would fall. Now you're making us correct, right? I think that, no, I think there still could be a unanimity problem. I don't think that the fact that they made the finding that the 100 grams... that there was a responsibility for 100 grams, particularly given our instructional error, which we're projecting that... You can argue that again in a minute, but let's do one thing at a time. Okay, so... but there is also the possibility that they listened to a call that was not admitted into evidence, that was on the CD that went into the jury room, in which Leake does describe... Well, the government says all the things on the CD were admitted into evidence, they just weren't all played. Is that wrong? I think that's wrong based on the stipulation which said that they were only admitted subject to objection, and admittedly, Sanders did not object when they went into the jury room. But that does not mean that they could not be prejudicial if the jury listened to them, and if that call is what prompted... But if there's no objection, then they're in evidence. You may have a different argument about prejudice, but not that they weren't in evidence. I'm arguing prejudice now for purposes of the special unanimity argument. Yes. If they listened to that call, and that was what prompted them to reach the 100 grams... certain jurors to reach a 100 grams verdict with respect to Sanders and Leake alone, that would then raise serious special unanimity problems. Which was the call you're talking about? Excuse me? Which call? It's the call that ends in number 350, and it was on a CD. Who were the players? Leake and an unknown person. Counsel, can we go back to your opening sentence, in which you say that the poppy grower, and wherever they grow, would be a conspirator under some view looser than yours. But suppose we have quantities that are high enough so that they're not merely consistent with distribution, they're unequivocally consistent with distribution. In other words, they cannot be explained without distribution. And suppose we have repeat sales, and suppose we have extension by the seller of, or at least the offer of extension by the seller of credit. But otherwise, the buyer keeps his business separate. Why isn't that enough for conspiracy? Instead of looking around for some magical extra little bit that in substance makes no difference, or should make no difference. I think it does make a difference, and I think the Supreme Court identified that in direct sales. There, there was the offering of special deals that prompted more sales. There was a kind of a relationship in which there was more prompting. Well, I did mention the offering extension of credit. The offer of extension of credit, I think one thing to note about that, is that the actual payment for that was $100 per gram, and that there was no, with respect to the later sales for $50 and $25 per, $50 and $25 grams, excuse me. Those sales were also at a higher rate than $75 a gram, so there was no reduction for ongoing business relationship in terms of the price. Well, I don't know. It seems to you you're getting into the weeds of the business relationship more than is necessary for purposes of making sure that conspiracy is limited to people who know basically what they're doing and have an ongoing purpose of continuing it. So the Seventh Circuit in the Union is. . . The Seventh Circuit appears to be something of an outlier here. Well, the Seventh Circuit has some interesting opinions, including one by Judge Posner, which is Menzella, and it's cited in Townsend. I was going to cite Nunez, in which that circuit did recognize that fronting is a frequent occurrence between drug dealers, and I would observe as well that Hayward Sanders counted the cash in the first deal of this deal. So there are some countervailing considerations, but Judge Posner. . . I think you're getting into extraordinary weeds on just the exact nature of the relationship. So I think that the interesting analysis by Judge Posner and Menzella explains why, when you have a crime such as distribution that necessarily involves two people, then conspiracy must require something more because conspiracy is. . . The purpose of conspiracy is to punish people for joining together to engage in a crime. Well, that's why I mentioned repeat transactions. . . Even repeat sales. What? Repeat sales without any kind of interdependence, without warnings, without trust, without any evidence. The fronting. . . But again, I mean, the interdependence is built into the economic relationship. So it seems to me you and the Seventh Circuit want us to be hunting around for completely peripheral details. Then how is a jury to distinguish a buy-sell agreement between somebody who really is indifferent to their buyers and their sellers to people who simply engage in a drug transaction from a conspiracy? Is there no difference? If that's true, then where does it stop? Is everyone dealing drugs in the District of Columbia or anywhere? You say where does it stop, but if we have those three things, quantities only consistent with distribution, repeat transactions, and at least offers of credit of some sort, and suppose that's the line, that's sufficient, anything less is insufficient, then what do we add in terms of the materiality of the relationship when we started putting in frills like was the first sale, did he count the cash? I mean, that seems to me extraordinary. When I say it seems to me extraordinary, not counting the cash, but making that a determinative proposition. He also says no at first when Joseph proposes a lower price, when he says can you do one for the seven and Sanders says no. Well, negotiate. People in a conspiracy negotiate. Just as buyers and sellers do. That's true. I don't think that fronting alone can be a set rule that this court adopts to distinguish buy-sell agreements from buy-sell transactions between disinterested players who are independent from a conspiracy. A conspiracy should, if all the government needs is to trace it. You make a conspiracy sound like a sports team. You really want them working together. A conspiracy is something that requires something more than what this underlying crime requires. The underlying crime of distribution, even repeated distribution, requires two parties to engage in it. It requires making some arrangements to meet in order to distribute. It requires, in some cases, the dealing with the money. It requires all of that is inherent in the crime of distribution itself. What is more hopeful about that just because six grams out of several hundred were fronted? I don't see that that is susceptible or deserving of increased punishment over the crime of distribution itself. There's a larger question of whether conspiracy is a soundly reasoned crime, but that's not for us. No, I think that that is for Congress, and Congress has decided that, and I think that that's clear. But I do think that it requires an agreement that is something more than the underlying crime requires, and that we don't have here, in my view. I think that all we have is dealing between two independent parties, and the fact that there is no evidence that Sanders knew anything about re-bagging, cocaine, runners, lieutenants. But you don't doubt that he knew that that was happening. You just don't know. He doesn't know the specifics. You think he sold $36,350 worth of heroin, so he certainly didn't think that Joseph was taking all that heroin himself, did he? Couldn't Joseph be reselling it to another middleman in San Francisco? So he knew that he did have to know that there was re-bagging in some way, reselling in some way, redistribution, right? Potentially far down the line. He did not know where. He did not know it was happening blocks away. How far down the line does that extend? Does that extend forever? How many middlemen can a chain conspiracy draw in? Well, it's a good question, but it's not this question. This conspiracy is not drawn that large. This conspiracy has a specific number of people involved, relatively specific, relatively small geographic area. It doesn't extend forever. But the fact that they don't know each other, I recognize, is not a consideration. But they don't know what each other is doing. They don't know the scope of what this conspiratorial agreement is. All they know is that they are transacting in drugs that will continue to be, that are not usable, that are higher than a usable quantity, and we can see that. That is not, I would submit, when they know nothing about each other's activities and don't even know of each other or know each other enough, and when the evidence is so thin that they have joined together in a plan, then they're not protecting each other, or there's no evidence of that. There's no evidence of that. Well, there's the discussion about there's people watching me. You could certainly take that to be protecting with respect to the police. That's a fear for himself. It's not an expression to Joseph, be careful for yourself. It's not an expression to him, people might be watching you. It's an expression of fear that he might be... Well, that's one way to take it. Another way to take it is, we're in this together, people are watching me. That's sort of for the jury to decide. And Joseph said that he might just be saying guys in the neighborhood. He's not necessarily talking about the police. So there's no distinct evidence that that was a reference to the police. He does twice suggest that Sanders look elsewhere for other sources, and I think you can compare the Richardson call about the police stop and confiscation of the $3,500, and you can compare Wallace and Joseph. And I think an interesting comparison to make is with Cross, this court's case, because in Cross, I think that the player in this conspiracy, who is most like Cross, is Marcus Wallace. Marcus Wallace was Joseph's lieutenant, and he re-bagged drugs, as Cross did for Toray, or as Cross did for himself. Cross alerted Toray when police raided his hotel, and here Marcus Wallace and Joseph are communicating about jump-outs. They plan another deal together, as Cross and Toray did. They discussed suppliers, as Joseph and Wallace did. So Cross and Toray and Joseph and Wallace both discussed their suppliers. Here, Sanders is a lot more like Big Brother, but if Big Brother had been the appellant in Cross, this court's consideration might have been very different. You opened with, before you sit down, you opened with saying there were actually four conspiracies here. What were the four? So there's one between Joseph and his crew, which is the Pyramid of Potomac Gardens conspiracy. There's one between Joseph and Richardson, one of his suppliers. There's one between Joseph and Sanders based on the six sales, potentially, but the properly instructed jury could have found that that was just a buy-sell agreement. There was a buy-sell instruction, wasn't there? No, there was no buy-sell instruction. There was in Cross, but not in this case. And then there's another one potentially between Sanders and Leek, but I'm not convinced that the government has presented independent evidence about conspiracy aside from Leek's statements. I think the admission of, I think what the government really did here was lump two other cases in on Sanders. So if the government was going at the Sanders-Joseph six sales, it lumped the Potomac Gardens conspiracy in and it lumped the Leek conversations in. But how does that matter? If we find that there is sufficient evidence for the Sanders-Joseph, that is if we conclude for the reasons that Judge Williams just discussed with you, or even for fewer of those, even for the large amount, the repeated sales, that that alone is sufficient, that's a conspiracy, then all we have is, as Cross said, all we have is a variance problem, right? We agree that that's sufficient. Well, I think that in addition to variance, we're arguing especially unanimity in bi-cell. So both of those are somewhat independent from the multiple conspiracy variance question. But I think that we're not arguing that it's insufficient evidence of the Sanders-Joseph six sales. What we are arguing is that under Kodiakos, this court should look at whether it can be confident that a properly instructed jury, without all this extraneous evidence of cocaine and runners and lieutenants and the Leek conversations, which were terribly prejudicial, can it be confident that a jury would not have convicted of bi-cell and not conspiracy had they been instructed with a bi-cell instruction and had all this other evidence not come in? And I think, you know, this court talks about that recorded call suggests that the jury could distinguish between the various players. That is very true here with respect to Joseph and Richardson, and I would agree that that would be true with respect to Joseph and Richardson when you have a hard argument. It is not true with respect to Sanders and Leek. So if you take the Sanders-Joseph conversations and then you add in the Sanders-Leek conversations, in which it is Leek that makes very prejudicial statements in that event, I think that... But this is Sanders-Leek conversations. The Sanders-Leek conversations are very prejudicial to the Sanders, whether this conspiracy involves Sanders and Joseph in the six sales. So can this... What were the conversations, just, I'm sorry to extend this, what was the conversation between Leek and Sanders that's prejudicial? They talk about... Hang on just a second. They talk about that somebody... Well, that's the fat somebody doing great in the gardens. They talk about 600 a finger, 36 equals 2200. Is your argument that this was not conspirator hearsay and therefore shouldn't have been admitted or something else? It is that, but it is also... You're agreeing there is a possible conspiracy between Sanders and Leek. But that was separate. If this case involved simply Joseph and Sanders, then the Sanders and Leek... Let's say Leek had been brought in here and had not pled guilty. Leek would have moved for severance under Rule 8 to distinguish the 2010 activities from the 2009 activities. So all the conversations, he stole somebody's stash, 10 knives, we can get 50 times 10, we want two girls, has to take a COD, all of those conversations, and they're Leek's statements, not Sanders'. So if just Sanders' statements had come in and not Leek's, those calls would not look nearly as incriminating as they do. But is your complaint that they're hearsay and shouldn't have been admitted for this work? Yes. But there's still a conspiracy, and at least the Third Circuit has held that it doesn't have to be the same conspiracy as the one charged for hearsay to come in. A co-conspirator hearsay comes in not on a theory that it's the same conspiracy, but that it's two conspirators talking. Well, Leek is not a conspirator with Joseph and Sanders. But he's a conspirator with Sanders separately, and that's a separate case, and it should have been tried as a separate case. Had Leek been in this case... Nobody asked for it to be tried as a separate case, and they pled guilty, so it couldn't have been tried. But Sanders didn't have adequate notice before he went in of exactly how far this case was going to go, whether the government might have some evidence. Until the government closed its case, Sanders didn't know whether the government might have some evidence linking everything together, linking the rims of the spokes. He had the wiretaps, though, right? He had the wiretaps, but he had a lot of wiretaps, and he had a very vague indictment and broad. Okay. So thank you. If there's nothing else, I appreciate it. May it please the Court. Stephen Ricard on behalf of the United States. In response to Appellant's arguments, I'd like to focus on two main points. First of all, the evidence here was sufficient, and the government's argument was focused on the conspiracy to distribute heroin at Potomac Gardens, and the evidence was sufficient that Appellant joined that conspiracy. The second point I'd like to get to, then,   And the second point I'd like to get to is that this Court can be assured not only because that's where the argument and the evidence was focused, but also because of the special finding of 100 grams. On the first question, I'm going to judge Williams' questions of Appellant's counsel about the nature of the conspiracy. This was not a case where the government was advancing a conspiracy theory that would have held a farmer in Afghanistan liable for the conspiracy. Appellant lived at Potomac Gardens. He met Joseph at a school, behind a school, near Potomac Gardens. Yeah, I'm sorry, he lived two blocks away, in the neighborhood of Potomac Gardens, in the neighborhood where the park was, and the fence project on the park where Appellant's distribution was centered. He provided testers to Appellant, which is another factor that shows a knowledge of a distribution network that's going on. Which he are we talking about now, Joseph or Appellant? Appellant, prior to sales, there was testimony that we have these specific sales which total, Your Honor gave the dollar value, I totaled it as the quantity, which was 481 grams of heroin total. But we also have testimony that aside from those sales, and prior to the sales, Appellant provided Joseph with testers, small quantities that Joseph could test. And as Joseph said, the very first tester was 10 out of 10 the best heroin he'd seen in the area in a long time, which is what led him to buy additional drugs from Appellant for his network. How is that different than in a buy-sell relationship? What does the testers have to do with it? Any buyer wants to know whether they're really getting heroin? It shows that this is not just a simple one-time transaction, but rather it's contemplating an ongoing relationship and contemplating the relationship where the heroin that's purchased by Joseph is going to be redistributed for sale. I think Appellant's counsel just conceded the quantity alone demonstrates that,  There's other calls that haven't been highlighted that don't go to a specific sale, but that show the kind of ongoing relationship that's present between the two of them. Even when they're not engaged in setting up a specific meeting, there's conversations back and forth about the nature of supply in the area, the prospects that Appellant has for resupply, that show the kind of relationship between these two people, and it's not a mere arm's-length relationship. It's a relationship where they continue to discuss the prospects for Appellant obtaining more heroin to supply the Sanders Network. And of course, most powerfully, we have the call that comes after the conspiracy, I'm sorry, not after the conspiracy, but after the specific sales, that shows that Appellant did in fact know not only that this heroin would be redistributed, but that Appellant was also known as Fat Mac and was redistributing it in Potomac Gardens and doing very well in the course of that. Although it's Lee who provides some of those details, the nature of the call, the nature of the conversation would allow a jury to readily infer that Appellant was aware of those details. In fact, he knows more about it than Lee does. He's the one who, once Lee brings it up and provides the initial details, supplies the identity and the fact that Lee, in fact, through Appellant, was providing heroin to Mr. Joseph. And that goes to the point that Lee's relationship to this is the classic sort of chain conspiracy that this court considered in the Tarantino decision. The government viewed, the government proved that there was a network distributed on the ground at Potomac Gardens, that Joseph was on top of that network, and then went off the chain, just as contemplated in Tarantino, from Joseph to Appellant and to Lee, and showed that those conversations, although there was no evidence, I think, as Judge Garland pointed out in the question, there was no evidence of a specific sales or quantities that passed between Lee and Appellant. Was there any indication that Joseph's distribution in Potomac Gardens was essential to the money he made from that to an ongoing relationship with Sanders supplying more heroin? I'm not aware of any evidence exactly of the nature that Your Honor suggested. I think that whenever you, I would submit that whenever you have these kind of wholesale quantities of heroin, 481 grams, you have to be providing them to a network that has distribution on the ground. As this Court's questions have recognized, you can't sell 481 grams of heroin just to a user. To put it differently, is there any indication, do you have any evidence, that the success of Joseph's distribution ring was essential to Joseph continuing to buy from Sanders? That if he couldn't distribute it, he couldn't buy anymore? Well, I think the wiretaps show that. I can't point to a specific one, but the wiretaps are page upon page of discussions about prospects for resupply and comparisons of quantity, quality, price, and what's dry, what areas are dry, what areas are wet, and where the next provision will come from. So Joseph is constantly pressing, and in fact Sanders is also having a conversation with Lee, about where's the heroin going to come from. So I don't think that's an explicit admission of the kind Your Honor's contemplated, but it does show that Joseph needs heroin in order to feed through his network and make money by selling it on the street, and that he's working through Sanders to get that heroin. I'd submit the jury could infer that that would be readily apparent to appellant. Could I question you a bit on when a multiple conspiracy instruction is needed? I think our cases really, although in different forms, say basically the same thing, and here you quote Judge Tatel and Graham, it's needed if the evidence supports a finding of multiple conspiracies. What does support mean? Suppose a jury could hearing all the testimony in this case, regard the Lee-Sanders relationship as separate from the Sanders-Joseph relationship by essentially selective credibility determinations, right? Believes there's no relationship between Lee and Sanders, but there's a conspiratorial relationship between them, which is not the same or part of the Sanders-Joseph relationship. Now that would seem to fit under the language that we use, and I should say that I used similar language in Tarantino, and I'm sure I got that from some older case. It seems to me if you bear in mind the possibility of selective credibility determinations, and when I was a U.S. jury, the judge always gave an elaborate charge on how the jury was entitled to do that, it's almost always the case, at least if more than two people are involved, for the jury to find two conspiracies possible as opposed to one, maybe three, four. I think there's two answers to your honest question, and the second, which I'd like to focus on, is that that's not what happened here, and I'll get into why. But first, in terms of the more theoretical question about whether there are views of the evidence and how that should work in terms of deciding whether to give a multiple conspiracy instruction, I'd acknowledge that there could be an analytical difference between the question about whether to give a multiple conspiracy instruction and the question about sufficiency or variance. Absolutely. And I think sometimes the cases have cited one in the context of the other. But that's because in both cases it's the same sort of question about whether there's multiple conspiracies and about prejudice. It's true that the filter of review might be different in terms of drawing all inferences in favor of the government or crediting the defendant's testimony. But in this case, that wasn't a problem. And in this case, because there was no evidence from the defense that suggested multiple conspiracies, and there's no real risk in this case that the jury would have made any sort of selective credibility assessment of the kind that Your Honor's proposing. So what you're saying is the court, both the district court when it's happening and the court of appeals and review, makes some assessment of the probability of a jury making selective credibility determinations? I find that very awkward. I mean, I understand why you argue it, but it still seems to me an extraordinarily awkward activity for a court to engage in. I think from the perspective of the trial judge in this case who did consider a felon's request for multiple conspiracies instruction and say he saw no evidence of it, he had just heard the government's opening, seen the government's evidence, and was very familiar with what the presentation of that entire case was. And I would ask the court, you know, in considering what the thrust of the evidence was and what the nature of the case was before the jury to look at the opening statement where the government started off by saying this is a case about an on-the-street distribution network in Potomac Gardens, and it's a case where we're going to show that a felon joined that conspiracy. I mean, I'm not sure how that helps. I mean, of course the government would put it that way. Well, it helps because there's no concern based on the arguments and evidence that were presented to the jury and, of course, the jury's special finding of 100 grams, which I want to get to. It shows that the jury in fact determined that a felon was part of that distribution network at Potomac Gardens, which is what the government's theory was. The idea that the jury would credit some part of the testimony that there was some relationship between Sanders and Leak or between Joseph and Richardson and then hold the pellant responsible for that as opposed to holding the pellant responsible for his direct dealing. But we don't have any quantity or money coming in from the Leak relationship, right? And I think... So suppose the jury cars out a Leak-Sanders conspiracy that goes on to find the 100 grams and so forth, right? I'm not... It's not your fault. I just am somewhat baffled as to how a court is supposed to go about this process. I think that Tarantino and Your Honor's decision in Bogom and Mathis all provide a framework for that, which is where you have... I know. We say it. We say it endlessly. And I think the trials court can look to see to the extent that there's a chain relationship or a hub-and-spoke relationship, the court can look to see whether there is a credibility dispute or any meaningful evidence that suggests an interpretation that would show multiple conspiracies. And I'd submit here there wasn't. And because, exactly as Your Honor has suggested, there was no evidence of quantity as to a pellant in Leak, that when the jury found unanimously 100 grams of heroin, that they were finding that based on exactly what they had been presented with. Are you saying that they couldn't have found a separate conspiracy between Sanders and Joseph? Well, I would argue the conspiracy between Sanders and Joseph is the charged conspiracy. That's the Joseph's conspiracy at Potomac Gardens that Sanders joined... Well, just to add, just back and forth between Sanders and Joseph. For all the reasons I articulated earlier about Sanders' awareness of Joseph's activities... That's all reasons why it's sufficient, why your argument for Sanders  I understand that. But imagine you only had Sanders and Joseph and you just had the information about the six deals. Wouldn't that be sufficient for... Wouldn't the government consider that sufficient for a conspiracy? Yes, and in fact, that would also be the conspiracy charge. This Court has cited the Supreme Court case, I believe it's Butler, to say that if you charge nine people in a conspiracy and seven of them are acquitted, that doesn't affect the verdict between the two who are guilty. Of course, that's not what happened here. But if we charge a conspiracy and happen to have a failure of proof as to some members of that conspiracy, that doesn't negate the government's case against those people who were a member of the conspiracy. So even if there was... As Judge Randolph points out, there were other members who pled guilty in this case, but even if there was some doubt as to whether or not someone else was a member of the conspiracy, that wouldn't negate proof that a telling was made. And the guilty pleas were introduced. I did want to correct that. I don't believe that... I believe that Mr. Joseph's guilty plea was introduced, that he pled to being involved in the distribution of 3 to 10 milligrams. Mr. Leake's plea, I don't believe, was introduced at trial. It's part of the... It's part of the case in that he pled guilty in this case, but I don't think the jury was presented with that information. You sure about that? I'm reasonably confident. Sorry? I'm reasonably confident that that was not presented to the jury. It was Joseph's plea... I know that Joseph's plea agreement was introduced to the jury, and I know that no other plea agreements were specifically introduced. But for all the reasons I've already stated, we'd argue that the jury would find that it could view Leake as part of the conspiracy, and that even if that wasn't the case, that there was ample and sufficient evidence and proof on this record that the jury had convicted the appellant based on his dealings directly with Joseph. If he had just been charged with the... This is really not a legal question or analysis, but if he had just been charged with the six sales, what would the sentencing be if he had been convicted of that? We would be in district court in Maryland as opposed to in D.C., I think, because a full five of the six sales occurred in Maryland, so that's one aspect of it. But at sentencing in this case, there was a discussion of the quantity that the appellant was held responsible for, and he was held responsible for 481 grams, which is his direct dealing with Joseph. So this isn't the kind of case which I think has prompted some of the concerns in the Seventh Circuit or in other circuits where one small engagement in the conspiracy then imputes massive liability beyond that. Here, the appellant is serving a 63-month sentence based on the 481 grams he provided. I looked. I didn't see any evidence that Sanders ended his relationship with Joseph prior to his arrest. Is that accurate? But there was no activity between, what, March and June? Well, I think that's correct. The sales stopped at a certain point. The talking on the phone about prospects continued, and then, of course, government's wiretaps moved up the chain and, I believe, at a certain point, the government wiretaps were no longer focused on Joseph but were focused on Lee. And search warrants were executed in May? Yes, Your Honor. Unless there are any further questions, we ask that the judgment of the district court be affirmed. Thank you. Does Ms. Dyer have any more time? Would you take another couple minutes? Thank you very much, Your Honor. In response to Judge Randolph's question, I don't believe there's any evidence that Joseph's business helped Sanders' business. I don't think there's any evidence that Joseph's continuation of business helped Sanders in any way. The trades between... The last communication between Joseph and Sanders was in January 2010, and after that, there's no evidence of further communication with them until the arrest. In response to Judge Williams' questions about what the district court is supposed to do with these instructions, if it is baffling to the court and the courts, then imagine a jury who is instructed merely that they must find an agreement that the defendant joins... Oh, I think on the contrary. I think a plethora of multiple conspiracy charges in a case like this would be very confusing to the jury. At least could be, unless they're very carefully worded. Well, I think another point I would make is this court's recognition in Baum about the complexity of buy-sell agreements and what goes into them. And in Baum, there were many, many more sales. There were 20 or 30 sales. And still the court analyzed buy-sell agreements and was not limited by number of sales in that case. There were many considerations that went into that. Were those wholesale sales? They were... I believe they were wholesale... I don't know if they were... They were not end-user sales, but they may have been closer to the end... They may have been more like a run of the tenant. Like most courts, we tend to put in every fact that sustains the conclusion reached. Well, if the conclusion reached is not unanimous on exactly what happened here, it's very unclear to me what the jury was supposed to do with this case and how they were supposed to decide it. When he asked for a multiple conspiracies instruction, did he say what the multiple conspiracies he was alleging were? He did not. But he had proposed a multiple conspiracy instruction in advance of trial and laid it out in a proposed specific language his counsel had. And I think that at that point it should have been clear to the district court what those instructions were. And if there were a multiple conspiracies instruction that just says if you find multiple conspiracies, you've got to find unanimity about which one, would that not have been confusing without identifying what the potential multiple conspiracies were? Well, I think that's a jury question, what they are. But I think that the jury could at least be alerted that the government was required to approve a single conspiracy, the one stated in the indictment, and that if the defendant was not convicted of that conspiracy, then the jury must acquit. Does the defendant not have to advise the court as to what other conspiracies he thinks there was sufficient evidence of to require instruction? I don't think to preserve the error or to preserve a request for a multiple conspiracy instruction, the court does not ask any further questions about it. And when, as in this case, I believe the evidence was clear that there was no, various people did not know of each other or know each other, and that really was the defense. I mean, Mr. Sanders made that argument in his closing argument, that I don't know anybody in Potomac Gardens, I don't know anything about cocaine, I don't know all of these other things that happened. It has nothing to do with this. He didn't testify to any. No. So those statements, none of that is evidence. Correct. In response to Judge Randall's questions, there was no, I don't believe Leek's plea agreement did come in. It is in my office, which is why I was remembering that I had looked at it, but I did not remember specifically what it says. There was no PWID or distribution charge in this case, so that Sanders wasn't, the jury's alternative was not to convict Sanders of actual drug sales to Joseph. Did the indictment go to the jury? I don't know, but it was read to the jury. Was it redacted after the pleas? No. So it named all nine? All nine defendants, correct. And the government named those nine defendants in its closing argument as well. So I don't, the jury only had a conspiracy charge, and our argument is that it could have acquitted him based on buy-sale instructions, had only that evidence gone to the jury. Thank you. Thank you. We'll take the case under submission.